McDonald v. SSA                    CV-97-658-JD   11/23/98
                UNITED STATES DISTRICT COURT FOR THE
                     DISTRICT OF NEW HAMPSHIRE


Stephen T. McDonald

     v.                              Civil No. 97-658-JD

Kenneth S. Apfel, Commissioner,
Social Security Administration


                            O R D E R


     Plaintiff, Stephen T. McDonald, brings this action pursuant

to 42 U.S.C.A. § 405(g) seeking judicial review of a final

decision by the Commissioner of the Social Security

Administration denying his application for disability benefits.

Plaintiff contends that the Administrative Law Judge's ("ALJ")

decision finding him not disabled and denying benefits is not

supported by substantial evidence in the record.  For the

following reasons, the Commissioner's decision is reversed, and

the case is remanded for further administrative proceedings.


                        Background[1]

     Stephen McDonald was born in 1945 making, him forty-nine

years old at his last-insured date on September 30, 1994.  He has

_____

     [1]The background facts are taken from the parties' joint
statement of material facts and from the record.

a high school education, and his prior work experience was primarily as an iron worker. McDonald was injured in a workplace accident in 1986 when he fell thirty feet through an unmarked opening in the floor at a construction site and sustained multiple fractures and trauma. He received social security benefits from the time of the accident until July 31, 1988, when he was determined to no longer be disabled having achieved the functional capacity for a wide-range of work at the sedentary to light work levels. In his current application for benefits, McDonald alleged an inability to work since September 1, 1988, due to the residual effects of a motorcycle accident in 1977 and the workplace accident in 1986.

McDonald was treated intermittently between 1988 and 1994 by William J. Kilgus, M.D., an orthopedic surgeon. During 1989, Dr. Kilgus saw McDonald on three occasions for persistent pain in his right knee. He was treated with anti-inflammatory medication for arthritis in the knee. The examination notes for April 11, 1990, report complaints of persistent pain in McDonald's right arm and leg, and his neck and back.

McDonald underwent a physical capacity evaluation on April 3, 1990, from which was determined he was capable of light-duty activity. Because of McDonald's sedentary life-style, the examiner noted that it might be appropriate for him to engage in

a three-week work hardening program in order to more accurately assess his tolerance for full-time work. On April 25, 1990, Dr. Kilgus reported that McDonald had a chronic lumbar strain with some muscle weakness as a result of the workplace accident in 1986 and that he was permanently disabled by thirty percent. Dr. Kilgus also wrote that McDonald would be able to work at a job requiring working with his arms and hands and partial sitting and partial standing.

In June of 1990, Richard Guare, Ph.D., conducted a neuropsychological evaluation of McDonald. Dr. Guare found that McDonald displayed uncertainty, anxiety, and depression consistent with a disabling trauma such as his work accident injury. He indicated that McDonald retained general cognitive abilities in the average range and that any deficits were not severe. Dr. Guare also suggested that McDonald would benefit from occupational training modified to meet his needs.

McDonald returned to work in May of 1993 doing light duty landscaping at a cemetery. His medical records resume in November of 1993 when he aggravated his back condition at work. When he was examined by Dr. Kilgus on November 24, 1993, McDonald reported that he injured his back on November 17 and that the symptoms had worsened in the intervening week. McDonald described pain in the lower back present primarily when bending

3

or lifting.  The pain did not radiate to his legs.  During examination, Dr. Kilgus found a fair range of motion in the lumbosacral spine, straight leg raising was negative, and neurological findings were "intact."  X-rays were interpreted to be within normal limits.  Dr. Kilgus diagnosed an acute lumbar strain and prescribed conservative treatment.

On January 25, 1994, McDonald had a magnetic resonance imaging ("MRI") of the lumbosacral spine that was interpreted to show a central and left lateral disc herniation at the L5 - S1 area and degenerative changes.  Dr. Kilgus continued to treat McDonald conservatively.  He noted chronic lower back pain with some radiation to the right leg.

In a letter dated February 28, 1994, Dr. Ronald Faille, a neurosurgeon, reported to Dr. Kilgus on his examination of McDonald.  Dr. Faille described McDonald's reports of persistent pain on the left side of his back.  After a physical examination and review of the MRI, Dr. Faille diagnosed a herniated disc at L5 - S1.  He recommended continuing conservative treatment.

Dr. Kilgus completed an attending physician's statement dated October 19, 1994.  He noted the first date of treatment as November 24, 1993, and the most recent treatment on August 16, 1994.  Dr. Kilgus wrote that McDonald had been permanently and totally disabled from doing any work since November of 1993.

4

On January 3, 1995, Dr. Burton A. Nault, a medical consultant to the Disability Determination Services ("DDS"), reviewed McDonald's records to assess his capabilities from September 1, 1988, through September 30, 1994. Dr. Nault acknowledged McDonald's multiple significant impairments, but concluded that he retained the capacity to do light work avoiding repetitive bending and lifting.

James M. Claiborn, Ph.D., a clinical psychologist, evaluated McDonald on January 21, 1995. Dr. Claiborn noted that McDonald appeared to be in pain and frequently alternated between sitting and standing. He found that McDonald was well-oriented, although he appeared to be depressed. Dr. Claiborn noted that McDonald was able to focus on some tasks, although he was disrupted frequently by his need to change position due to pain, and that he could deal adequately with supervision and with his co-workers in a workplace environment, except for his need to change positions. Dr. Claiborn found that McDonald had difficulty with short-term recall and was likely to forget oral instructions.

Another DDS assessment of McDonald's records was done on January 26, 1995. Udo Rauter, Ph.D., a clinical psychologist and consultant to DDS found that while McDonald had a moderately severe impairment due to his head injuries, he remained capable of performing simple straight-forward unskilled work activity.

5

Dr. Rauter's findings were affirmed by Gordon Thomas, M.D. on March 9, 1995.

McDonald was evaluated for physical capability on March 9, 1995, and March 24, 1995. He was found to be capable of part-time sedentary work, but due to poor fine motor skills, he was not considered to be qualified for assembly work. The evaluations also concluded that he would need a work environment that would allow him to change positions between sitting, standing, and walking as needed.

Dr. Kilgus submitted a report dated November 17, 1995, based on his history of treating McDonald since November of 1993 and a last examination on October 16, 1995. He identified diagnoses of chronic lumbar strain, degenerative disc disease in the lumbar spine, and herniated lumber disc. In his functional capacity assessment, Dr. Kilgus said that McDonald could only stand or walk for uninterrupted periods of thirty minutes and for a total of two hours in an eight-hour work day and that he could sit for an uninterrupted period up to one hour for a total of three hours in an eight-hour work day.

In a letter dated March 7, 1996, Dr. David E. Corbit explained that he treated McDonald for occipital trauma after a motorcycle accident twenty years earlier. He reported that McDonald then had a visual field defect due to injuries from the

6

accident.  Dr. Corbit examined McDonald on March 5, 1996, and found visual acuity best corrected to 20/25 in the right eye, and approximately 20/80 to 20/100 in the left eye.  Dr. Corbit also found permanent severe visual field defects that would cause difficulty for reading and close work.

McDonald was represented by counsel at the hearing before the ALJ on December 7, 1995, and his wife also appeared and testified.  The ALJ issued his decision on February 8, 1996, concluding that although McDonald had severe impairments and was unable to return to his previous work, he retained the ability to do a limited range of light work and was not disabled.  The Appeals Council denied review.  McDonald then initiated his appeal in this court and the Commissioner moved to affirm his decision denying benefits.

## Standard of Review

The court must uphold a final decision of the Commissioner denying benefits unless the decision is based on legal or factual error.  <u>Manso-Pizarro v. Secretary of Health and Human Servs.</u>, 76 F.3d 15, 16 (1st Cir. 1996) (citing <u>Sullivan v. Hudson</u>, 490 U.S. 877, 885 (1989)).  The Commissioner's factual findings are conclusive if based on substantial evidence in the record.  42 U.S.C.A. § 405(g) (West Supp. 1998).  Substantial evidence is

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quotation omitted).

## Discussion

McDonald's application was denied at step five of the sequential evaluation process set forth in 20 C.F.R. §§ 404.1520 (1996).[2] At the fifth step, the Commissioner has the burden to show that despite the claimant's severe impairment, he retained the residual functional capacity to do work other than his prior work during the covered period and that work the claimant can do exists in significant numbers in the relevant economies. See Heggarty v. Sullivan, 947 F.2d 990, 995 (1st Cir. 1991). McDonald contends that the ALJ's findings were not supported by substantial evidence, that the ALJ failed to properly consider

---

[2] The ALJ is required to make the following five inquiries when determining if a claimant is disabled:

  (1) whether the claimant is engaged in substantial gainful activity;
  (2) whether the claimant has a severe impairment;
  (3) whether the impairment meets or equals a listed impairment;
  (4) whether the impairment prevents the claimant from performing past relevant work; and
  (5) whether the impairment prevents the claimant from doing any other work.

20 C.F.R. § 404.1520.

evidence of his impairments, and that the ALJ improperly relied on the Medical Vocational Guidelines, Table No. 2, Appendix 2, Subpart P ("the Grid").

A.  The Record for Review

As a preliminary matter, the court notes two issues pertaining to the record. First, a significant portion of the evidence described in the parties' joint factual statement pertains to evaluations of McDonald's condition conducted after September of 1994, beyond his covered period. Because a claimant bears the burden of proving that he his impairments were disabling within the covered period, only evidence pertaining to the existence and severity of a claimant's impairments during the covered period is relevant to review a disability determination. See, e.g., Evangelista v. Secretary of Health and Human Servs., 826 F.2d 136, 140 n.3 (1st Cir. 1987); Cruz Rivera v. Secretary of Health and Human Servs., 818 F.2d 96, 97 (1st Cir. 1987); Marcotte v. Callahan, 992 F. Supp. 485, 491 (D.N.H. 1997) ("Retrospective diagnoses (medical opinions of claimants' impairments which relate back to the covered period) may be considered only to the extent that such opinions both substantiate a disability that existed during the eligible period and are corroborated by evidence contemporaneous with the

9

eligible period."). In this case, however, neither party addresses the question of whether the late evidence would qualify as retrospective diagnoses or otherwise sufficiently pertains to the covered period to provide relevant evidence of impairments during that time.

Second, the letter from David E. Corbit, M.D. that is dated March 7, 1996, was written after the ALJ's decision on February 8, 1996. The letter was included in the administrative record submitted to the Appeals Council, which then denied review. The circuits are split as to whether evidence submitted only to the Appeals Council, and not to the ALJ, should be considered on appeal to a district court when the Appeals Council has denied review making the ALJ's decision the final decision of the Commissioner for review. Compare Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998) (holding that new evidence submitted only to the Appeals Council is not part of the administrative record for judicial review and citing cases), petition for cert. filed, (U.S. Oct. 20, 1998)(No. 98-6592); with Perez v. Chater, 77 F.3d 41, 44 (2d Cir. 1996) (holding that new evidence is properly considered as part of the administrative record for judicial review and citing cases). The First Circuit has not addressed the question.

The Commissioner has not objected to the records generated

after the covered period, including the Corbit letter.  The
parties' joint factual statement includes the late evidence
without comment or explanation.  For that reason, the court will
not sua sponte exclude evidence that both parties apparently
believe is properly considered as part of the record on review.
Nevertheless, as is discussed below, the failure to distinguish
relevant from possibly irrelevant evidence hampers an appropriate
analysis of the evidence in this case.

B.  Evidence of Claimant's Functional Capacity for Work

The ALJ found that McDonald was capable of lifting ten
pounds frequently and twenty pounds occasionally so that he
retained an exertional capacity for light work although he was
restricted from frequent crouching or kneeling.[3]  The ALJ also
found that McDonald's head injuries in 1986 and in a previous

---

[3] Light work is defined in the regulations as:

Light work involves lifting no more than 20 pounds at a
time with frequent lifting or carrying of objects
weighing up to 10 pounds.  Even though the weight
lifted may be very little, a job is in the category
when it requires a good deal of walking or standing, or
when it involves sitting most of the time with some
pushing and pulling of arm or leg controls.  To be
considered capable of performing a full or wide range
of light work, you must have the ability to do
substantially all of these activities.

20 C.F.R. § 404.1567(b).

11

motorcycle accident had not caused severe impairments.  Taken in light of McDonald's daily activities and previous work, the ALJ concluded that his complaints of disabling pain were not entirely credible.  The ALJ then relied on the Grid to determine that McDonald retained the ability to do other work that exists in significant numbers in the national economy.

McDonald contests the ALJ's assessment of his residual functional capacity and the severity of his cognitive and visual impairments.  He argues that the ALJ impermissibly substituted his own assessment of his physical abilities based on raw medical data when his medical records demonstrated that he had a serious physical impairment.  See Manso-Pizarro, 76 F.3d at 17.  The ALJ's analysis, citing medical diagnoses and treatment by Dr. Kilgus and Dr. Faille without explaining the source for the residual functional capacity determination or discussing the evaluations done by Dr. Kilgus and the New Life Back Center, does raise a question as to whether the ALJ properly considered the evidence of record.

1.  Physical Capacity

On appeal, the Commissioner points to a physical capacity evaluation done in April of 1990 and an assessment of McDonald's records from September 1, 1988, until September 30, 1994, by DDS

12

consultant Burton Nault, M.D. in support of the ALJ's determination. The physical capacity evaluation by the New Life Back Center in April of 1990 found McDonald had light-duty work capacity for lifting twenty pounds infrequently and ten pounds frequently from waist level to overhead but that from the floor to waist level he was limited to ten pounds since he could not squat to lift heavier weight. The evaluation also found McDonald's sitting and standing tolerances were observed as thirty and twenty minutes at a time, respectively. The DDS physical assessment, completed in January of 1995 and based on McDonald's records during the covered period, found him capable of lifting twenty pounds occasionally and ten pounds frequently, and also found him able to sit or stand for six hours in an eight hour work day with only normal breaks. The DDS review evaluated McDonald as able to do light work while avoiding repetitive bending and lifting.

In contrast, Dr. Kilgus's evaluation for an "Attending Physician's Statement" in October of 1994, which was done after McDonald injured his back at work in November of 1993, found that McDonald was unable to do any work. A subsequent evaluation by the New Life Back Center in March of 1995, found a capacity for only part-time sedentary work and only an ability to occasionally lift up to five pounds from the floor to waist level, seven and a

13

half pounds from waist to shoulder level, and five pounds from shoulder to overhead. The assessment found no ability to lift or carry frequently. McDonald was assessed as able to sit for only ten minute intervals and to stand or walk in twenty-five minute intervals. He was also found to possess poor fine motor skills and was determined not to be qualified for assembly work.

Records from September and October of 1995 indicate that McDonald attempted part-time work in a bench assembly position but was advised by his treating doctor, Dr. Kilgus, to stop because of increasing pain. In November of 1995, Dr. Kilgus diagnosed McDonald's physical limitations as being due to spasm and weakness of the lumbar spine since his injury in November of 1993. He indicated that McDonald was able to lift and carry only ten pounds infrequently, that he could stand or walk for only two hours in an eight hour day at thirty minute intervals, and he could sit for three hours in an eight hour day at one hour intervals.

Generally, the opinions of treating and examining sources are given more weight than those of non-examining sources. 20 C.F.R. § 404.1527(d)(1) and (2). Thus, although the DDS record assessment would support the ALJ's determination, the New Life Back Center examination and evaluation in April of 1990, is less supportive and is entitled to more weight. The physical capacity

14

evaluations done in 1995 by the New Life Back Center and Dr. Kilgus, examining and treating sources respectively, directly contradict the ALJ's determination. To the extent that the 1995 evaluations are relevant evidence, they also undermine the DDS assessment. Since the DDS assessment is inconsistent with the record taken as a whole, it is entitled to little weight in light of the opinions of the examining and treating sources.

An ALJ is expected to explain the weight given to a treating source's opinion. § 404.1527(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). Here, the ALJ did not discuss the evaluations and opinions of either Dr. Kilgus or the New Life Back Center. The ALJ's decision lacks sufficient explanation for the determination that McDonald was capable of light work. The ALJ did not distinguish between evaluations of McDonald's abilities before and after November of 1993, when he injured his back while working; did not explain whether the late-generated evidence was considered as part of the determination; and did not identify what weight was given to the various opinions in the record.

On appeal, the Commissioner acknowledges differences in the opinions included in the record and does not rule out the late evidence as irrelevant to the covered period. While the

15

Commissioner is correct that the disability determination is reserved for the ALJ, 20 C.F.R. § 1527(e), the opinions of treating and examining sources as to McDonald's physical capabilities cannot be ignored without explanation. On this record, therefore, the Commissioner, who bears the burden at the fifth step of the analysis, has not shown that substantial evidence exists in the record to support the determination that McDonald was capable of light work during the covered period.

2. <u>Mental Capacity</u>

The ALJ found, based on evaluations in June of 1990 and a consultative assessment in January of 1995, that McDonald did not have severe impairments due to his head injuries or possible organic brain syndrome. On appeal, McDonald argues that the records show that he had significant impairments of memory, attention, and vision resulting from his head injuries in 1977 and 1986. Despite evidence of McDonald's memory and attention deficits, substantial evidence exists in the reports the ALJ references that supports the ALJ's determination as to those impairments.

With respect to the vision defect, however, the letter from Dr. Corbit dated March 7, 1996, suggests a serious vision problem that was not considered by the ALJ because the evidence was not

16

part of the record at the time of the ALJ's decision. Perhaps for that reason, there is little discussion of the effect of McDonald's vision defect on his ability to work. The record does demonstrate that the vision defect did not interfere with his ability to perform as an iron worker until his accident in 1986 or with a determination in 1988, affirmed in 1989, that McDonald was capable of sedentary to light exertional work as of July of 1988. To the extent the record supports additional exertional limitations on McDonald's ability to work since that time, however, if Dr. Corbit's letter is relevant to McDonald's covered period, it should be considered in combination with other limitations in the context of the record as a whole at the fact-finding stage.

C.  Use of the Grid

The Grid provides a "streamlined" method for determining whether jobs, which claimant can perform, are available when a claimant's nonexertional impairments do not significantly affect his ability to perform the full range of jobs available at the appropriate exertional level. Heggarty v. Sullivan, 947 F.2d 990, 995-96 (1st Cir. 1991). "Where a claimant has nonexertional impairments in addition to exertional limits, the Grid may not accurately reflect the availability of jobs such a claimant could

17

perform." Id. at 996.

The ALJ acknowledged that McDonald was not capable of the full range of light work, due to limitations on his ability to crouch or kneel. As the ALJ found that those limitations would not substantially affect McDonald's ability to do work at the light exertional level, he used the Grid to determine that jobs, which McDonald could do, existed in sufficient numbers to support a not-disabled finding. Evidence in the record does not support the ALJ's use of the Grid for that determination.

The ALJ did not address the more specific weight limitations identified in the evaluations by the New Life Center in both 1990 and 1995 concerning McDonald's ability to lift objects from the floor to waist level. The weight limitations, confirmed by Dr. Kilgus's assessment, combined with his inability to crouch or kneel, would substantially limit McDonald's ability to perform work that required lifting from below waist level. In addition, evidence in the record strongly indicates that McDonald's ability to sit or stand for long periods was limited by his back condition. Although the DDS evaluation found that McDonald could sit or stand for up to six hours in an eight hour day, other evaluations based on examinations, including observations by Dr. Claiborn during his psychological examination, indicate much less tolerance and indicate that McDonald might have required a sit or

18

stand option for work.

A restriction on a claimant's ability to do light work permitting him to alternate sitting and standing or limiting the amount of time in each position is a significant non-exertional limitation that precludes reliance on the Grid.  See Jesurum v. Secretary of Health and Human Servs., 48 F.3d 114, 120 (3d Cir. 1995); see also Heggarty, 947 F.2d at 995.  While it is not entirely clear from the record to what extent an option to sit or stand at will might have been necessary for work during the covered period, the record as it is presented for review suggests a potentially significant impairment.  McDonald's exertional impairments, taken in combination, seem likely to significantly restrict the jobs available at the light work level.  For that reason, the Grid does not provide substantial evidence that jobs are available that McDonald could do.

Conclusion

The record, as it is presented here, does not contain substantial evidence in support of the Commissioner's decision at the fifth step of the sequential analysis.  Accordingly, the decision is reversed and remanded for further consideration and explanation of the relevant evidence.  Claimant's motion

19

(document no. 4) is granted only to the extent that the decision is reversed, but denied as to an award of benefits at this stage of the proceedings. The Commissioner's motion (document no. 6) is denied. This is a "sentence four" determination.

The clerk of court is directed to enter judgment accordingly and to close the case.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
District Judge

November 23, 1998

cc:   Jeffry A. Schapira, Esquire
      David L. Broderick, Esquire

20